IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DARON DWANE HOWARD-BEY,      )
                             )
        Plaintiff,           )
                             )
v.                           )
                             )   CASE NO. 2:20-CV-724-RAH-CSC
                             )
                             )
SOUTHERN HEALTH PARTNERS et. al.,   )
                             )
        Defendants.

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.      INTRODUCTION

Daron Dwane Howard-Bey, an indigent state inmate filed this 42 U.S.C. § 1983 action, alleging that while he was housed at Covington County Jail he was treated with deliberate indifference when beginning January 27, 2020, through July 9, 2020, he was given the "wrong medicine that has made me paralyze." (Doc. 1 at p. 1). He later filed an Amended Complaint alleging that the CT scan taken the morning after his arrest on January 28, 2020, was "falsefiled {sic] in the medical exhibit to try to hide the stroke found" and that the alleged deliberate indifference to his medical needs continued through August 5, 2020. (Doc. 74 at p. 2). The named Defendants in this action include Southern Health Partners, ("SHP"); Kristen Terry, LPN and Medical Team Administrator for SHP at Covington County Jail; Jeff Edgington[1], Certified Registered Nurse Practitioner and Medical Director for SHP at Covington County Jail; Officer Nicolas Ireland, and Officer Jonathan Pitts. (Docs. 1 and 74).

---

[1] Jeff Edgington is incorrectly named in the complaint as Jeff Eddington. (Doc. 1).

The Defendants filed special reports (Docs 59, 60, 69, 82, and 102), which included relevant evidentiary materials in support of these reports, including affidavits addressing the claims presented by Howard-Bey, and medical and prison records.  In these documents, Defendants deny the claims against them.  Specifically, Defendant Officers Ireland and Pitt admit that they participated in Plaintiff's arrest, but deny that either interacted with Plaintiff in any manner while he was housed at the Covington County Jail and specifically deny ever providing any medicine to him. (Docs. 60-1 at p. 2; 82-1 at p. 3).  Nurse Terry denies that she has authority to prescribe medication for inmates and states that Defendant Edgington bears this responsibility.  She further states that she, along with all SHP nursing staff, have provided Plaintiff with medical care as ordered by the Medical Director/Provider.  (Doc. 69-1 at pp. 3-4).  Defendant Edgington confirms that he, as a Certified Registered Nurse Practitioner and the SHP Medical Director, is alone authorized to prescribe medications to inmates and that all medications provided by nurses to the Plaintiff at the Covington County Jail were prescribed by him.  (69-2 at p. 3).  He further testifies based on his treatment of Plaintiff and a review of his medical records that, "all treatment provided to the Plaintiff by myself, Nurse Terry and the SHP nursing staff was prompt, appropriate and within the standard of care."  *Id.* at p. 4.

After reviewing the special reports and exhibits, the court issued an order on August 20, 2021, requiring Howard-Bey to file a response to the Defendants' special report, supported by affidavits or statements made under penalty of perjury and other evidentiary materials.  This order specifically cautioned that "**unless within fifteen (15) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special reports and any supporting evidentiary materials

as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." (Doc. 105 at p. 4).

Howard-Bey filed responses to this order. (Docs. 108. 109, 110). In his responses, he provides more detail to explain his deliberate indifference claim. He claims that Defendants Terry and Edgington treated him with deliberate indifference because they failed to get hospital records which showed he suffered from Polymiosidis, a chronic muscle inflammatory disease, which placed him at increased risk for paralysis, a common side effect of Atorvastatin, the statin he was taking due to his high cholesterol. He further claims that this side effect was not discussed with him, and he was told to take the statin to control his high cholesterol. (Doc. 108 at pp. 12-15).

Howard-Bey also attempts to bring new claims, which were not plead in his complaint, as amended. For example, he claims that the officers who arrested him, including Defendant Officers Pitts and Ireland, failed to determine his medical condition at the time and failed to provide necessary medical assistance to him. (Doc. 109 at pp. 11-15). He also alleges that he was assaulted during his arrest. (Doc. 110 at pp. 15-18). However, these claims are not properly before the court because claims may not be raised for the first time in a response to a motion for summary judgment. *San Francisco Residence Club, Inc. v. Baswell-Guthrie,* 897 F. Supp. 2d 1122, 1214 (N.D. Ala. September 13, 2012). The complaint, as amended, is clear; Plaintiff claims that from January 27, 2020, until August 5, 2020[2], the Defendants treated him with deliberate indifference because they gave him medication which caused him to be paralyzed. (Docs. 1, 74). Thus, this is the only claim properly before the court for consideration at this time.

---

[2]   However, the undisputed medical records demonstrate that July 9, 2020, was Plaintiff's last day at Covington County Jail. (Doc. 69-2 at p. 15). Indeed, the records show that on that date, Plaintiff was transferred from Covington County Jail to the Emergency Room at Andalusia Health, where it was determined that he was having a heart attack and was then transferred to Baptist Hospital in Pensacola, Florida. He did not return to the Jail. *Id.*

Pursuant to the directives of the order entered on August 20, 2021, the court now treats the Defendant's special report and supplements thereto as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the Defendants.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and alerting the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is similarly required to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether a genuine dispute for trial exists, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmoving party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see* Fed. R. Civ. P. 56(a).

To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation, a pro se litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, Moore's pro se status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After such review, the court finds that Howard-Bey has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the Defendants.

### III. DISCUSSION

#### A. FACTS

Plaintiff claims that during his incarceration at Covington County Jail, he was given the wrong medicine which caused him to be paralyzed. Defendant Jeff Edgington, CRNP and Medical Director for Covington County Jail for SHP testified by affidavit as follows:

1. I am a Certified Registered Nurse Practitioner (CRNP). I received my Master of Science in Nursing with a specialty of Family Nurse Practitioner from the University of South Alabama in 2013. From March 2019 to the present, I have had a contract with Southern Health Partners, Inc. ("SHP") to be the Medical Director/Provider of the Covington County Jail (the "Jail") in Andalusia,

Alabama.

2. SHP provides medical care to patients in various jail facilities including the Jail. Health care services in the Jail are provided to the patients by SHP pursuant to a contract between SHP and the Covington County Commission.

3. Health care in the Jail is provided under the direction of an MTA as well as a Medical Director/Provider. During all times relevant to this lawsuit, Kristen Terry LPN ("Nurse Terry") was the MTA, and I have been the Medical Director/Provider.

(Doc. 69-2 at pp. 2-3). Defendant Edgington continues to testify as to the general medical practice at Covington Jail and specifically to the chronology of Plaintiff's treatment at the jail. He states as follows:

### i.    COVINGTON JAIL GENERAL MEDICAL PRACTICE

4. When a patient in the Jail requires routine medical care, he or she obtains a Patient Sick Call Slip ("Sick Call Slip") from the corrections officer on duty in the housing unit and that form is provided to the medical staff for action. Routine sick calls are conducted by the medical staff inside the housing unit.

5. Nurses in the Jail are authorized to provide medical treatment and to administer medication by implementing provider's orders under my direction. As Medical Director/Provider, I generally visit the Jail at least once per week to provide medical care to inmates.

6. As Medical Director/Provider, I am available to the nurses at all times for consultation. If a patient requests or needs to be seen by a doctor, a nurse will place the patient on the Provider list and will set aside the patient's chart for me to review. On my next visit to the Jail, I will review the patient's charts and review the treatment provided by the nurses. I will determine which patients need to be seen and will see those patients in the Jail medical office. In the event that any changes need to be made to a patient's medical treatment, I will enter new medical orders at that time. The nurses then implement my medical orders.

7. During the time he has been incarcerated in the Jail, Plaintiff has received medical attention for every medical condition which he has brought to the attention of Jail personnel.

8. Nurses at the Jail have no authority to prescribe medications. All prescription medications provided by nurses to the Plaintiff at the Jail were prescribed by me, and my prescribing and dosage instructions were followed by the nurses at the Jail.

9.  The SHP medical staff has provided Plaintiff with all of the medications, treatments, outpatient visits, and other medical care I have ordered.

10. Nurse Terry has never denied or improperly delayed medical treatment to the Plaintiff.

11. Based upon my treatment of the Plaintiff and review of his medical records, it is my opinion that all treatment provided to the Plaintiff by myself, Nurse Terry and the SHP nursing staff was prompt, appropriate and within the standard of care. On no occasion was the Plaintiff ever denied medical care, nor was any member of the medical staff ever indifferent to any of the Plaintiff's medical needs.

## ii. CHRONOLOGY OF PLAINTIFF'S TREATMENT

12. Plaintiff was booked into the Jail on January 27, 2020.

13. On the morning of January 28, 2020, Nurse Betty Wright ("Nurse Wright") was notified to check an inmate who was in cell block A. She entered into the block and found Plaintiff lying on the bed. His lips were swollen, and he was unable to open his mouth wide. He complained of left shoulder pain and moaned when moving. He stated, "My left side numb". Nurse Wright observed that Plaintiff's right hand was swollen. He stated, "I spit up blood". Another inmate informed Nurse Wright that Plaintiff had fallen twice getting up that morning. Nurse Wright directed correctional officers to bring Plaintiff to the Jail medical office.

14. Once Plaintiff was in the Jail medical office, Nurse Wright performed an initial medical screening. Plaintiff informed Nurse Wright that he had suffered a stroke one month earlier. She observed and noted that Plaintiff had no drooping of the mouth. She also observed and noted that Plaintiff had a swollen lip, left sided weakness, a swollen right hand, and his nose appeared to be bleeding when he was blowing it. She also noted that Plaintiff was unable to walk without falling. Plaintiff informed Nurse Wright that he had been "beaten". He stated that he had been treated for schizophrenia and bipolar disease, and was allergic to eggs and Solu-Medrol, and had a painful tooth due to decay. He informed Nurse Wright that he used liquor and beer on the weekends and had last consumed them two weeks earlier. Nurse Wright noted that Plaintiff's respirations were 18, oxygen saturations were 93%, pulse was 70, temperature was 97.5, and blood pressure was 150/78.

15. Nurse Wright contacted me. I issued medical orders to send Plaintiff to the Emergency Room for evaluation because he had fallen, and he had reported a history of a stroke.

16. Plaintiff was transported by Jail personnel to the emergency room at Andalusia

Health, where he was treated and released, then was returned to the Jail on the same day. The Emergency Room discharge instructions showed that Plaintiff had been diagnosed and treated for acute bacterial bronchitis, left-sided weakness resolved, left shoulder pain, and TIA (transient ischemic attack). He was prescribed aspirin 81 mg, one tablet by mouth daily and cefuroxime axetil (an antibiotic), 500 mg, one tablet by mouth twice per day for ten days.

17. Plaintiff was returned to the Jail on January 28, 2020. Upon his return, I issued medical orders aspirin (a blood thinner, for stroke prevention) 81mg, one chewable tablet by mouth daily, and cefuroxime axetil (an antibiotic), 500 mg, one tablet by mouth twice per day for 10 days.

18. On January 29, 2020, I saw Plaintiff in follow up in the Jail medical office. His discharge documents indicated that he had been diagnosed by the emergency room physician with a TIA. He informed me that he had experienced left-sided weakness since the previous November. I observed that he had residual left sided facial droop and left arm weakness. I ordered atorvastatin (for high cholesterol), 40 mg by mouth each night. I also issued medical orders for carotid doppler studies and directed that Plaintiff's laboratory reports be obtained from the emergency room.

19. A TIA is not a stroke. It is a temporary blockage of blood flow to the brain. A TIA may cause temporary weakness or loss of feeling in a person's face, arm, or leg on one side of the body, trouble walking, trouble moving the arms or legs, trouble seeing, loss of balance or coordination, headache, and other symptoms.

20. On the afternoon of January 30, 2020, Nurse Terry was called by a correctional officer, who informed her that Plaintiff had said he was having a stroke. Nurse Terry directed the officer to bring Plaintiff to the medical office, if possible. Two officers brought Plaintiff to the medical office in a rolling chair. Nurse Terry observed and noted that Plaintiff was tearful and told her that he had a "pins/needles" sensation on the left side. She noted that he was unable to grip with his left hand, his left arm was flaccid, and he was unable to move his left leg. His range of motion was within normal limits in his right extremities, and his grip was normal on the right. Nurse Terry noted that Plaintiff's blood pressure was 160/96, his heart rate was 84, and his oxygen saturation was 98% on room air. She contacted me, and I directed that Plaintiff should be transported to the emergency room for further evaluation. Nurse Terry called and spoke to a nurse at the emergency room. She then directed Jail personnel to transport Plaintiff to the emergency room.

21. From January 29 to January 31, 2020, the SHP nursing staff provided Plaintiff with the following medications, pursuant to my medical orders: Aspirin 81 mg, 1 tablet by mouth per day, cefuroxime axetil 500 mg, and 1 tablet by mouth twice per day.

22. On February 3, 2020, a carotid ultrasound was performed by ADS Mobile Ultrasound Services. Dr. James Collins reported that there was no significant

stenosis.

23. On February 5, 2020, Nurse Wright performed a History and Physical examination of the Plaintiff. He informed her that he had been hospitalized at Southeast Medical Center in Dothan in 2009, 2010, 2011 and 2012, and that he had been diagnosed with polymyositis (a chronic inflammatory muscle disease), schizophrenia, bipolar disorder and anxiety. He informed Nurse Wright that he was allergic to eggs and Solu-Medrol. He reported that he smoked two packs of cigarettes daily and had last smoked on February 4, 2020. He stated that he also smoked marijuana and had last used it in January. Plaintiff reported a history of problems with balance, dizziness, headaches, nervous disorder, heart, stroke, GERD, borderline diabetes, and muscle problems.

24. On February 5, 2020, Nurse Wright observed and noted that Plaintiff's pulse was 85, blood pressure was 126/64, temperature was 97.7, and oxygen saturation was 96%. His skin turgor was good, he had no problems with his ears, there were cavities in his teeth, his nose was patent, and his neck was within normal limits. His respirations were with ease, heart sounds were normal, spine was within normal limits, and he stated he had no problems voiding. His appearance and behavior were appropriate.

25. On February 16, 2020, Plaintiff submitted a Sick Call Request stating "I am experiencing severe headaches and numbness up and down my left side. I also would like copies of my hospital visit from January 27, 2019."

26. On February 17, 2020, Plaintiff submitted a Sick Call Request stating "Severe numbness on left side, I need to see my doctor. I also need a copy of my medical file." He indicated that he had experienced this problem "Since January 27, 2020".

27. On February 18, 2020, Nurse Terry saw Plaintiff in the Jail medical office for complaints of left-sided weakness. She noted that Plaintiff had been sent to the emergency room on January 27, 2020, for chest pain and weakness, and had been diagnosed with a TIA. She added, "Complaints of L sided weakness today. Educated inmate that after a TIA, weakness is normal. L side grips noted to be weaker than R side. A & O x 3. Ambulatory. Will consult with CRNP for further orders."

28. On February 21, 2020, Plaintiff submitted a Sick Call Request stating "I am in need of Triamcinolone cream, my skin is drying out and cracking. I also want to know when I will get my stress ball." Nurse Terry responded in writing, "OTC Eucerin ordered. K. Terry LPN".

29. During the month of February 2020, pursuant to my medical orders, the Jail nursing staff provided Plaintiff with the following medications: aspirin 81 mg, one tablet daily, Ceftin (antibiotic) 500 mg, one tablet by mouth twice per day from February 1 to February 7th; amlodipine (for high blood pressure and to prevent

stroke) 5 mg, 1 tablet by mouth each evening; atorvastatin (to lower cholesterol) 40 mg, 1 tablet per day by mouth; mirtazapine (antidepressant) 15 mg, one tablet by mouth at bedtime, levothyroxine (for hypothyroidism) 50 mg, one tablet by mouth daily, lithium carbonate (for bipolar disorder) 300 mg, one capsule by mouth daily, omeprazole (for GERD, gastrointestinal reflux disease) 20 mg one capsule by mouth daily.

30. On March 5, 2020, Plaintiff submitted a Sick Call Request, stating, "I am in need of something for pain, I have a toothache on the upper left of my mouth and I have a sharp pain running up and down my left side."

31. On March 6, 2020, Nurse Terry saw Plaintiff in the Jail medical office for complaints of pain in his left side. She noted that his blood pressure was 132/74, pulse was 70, respirations were 18, oxygen saturation was 98%, and temperature was 98.6. She observed and noted that his skin was warm and dry, pupils were equal and reactive, abdomen was soft, gait was steady, respirations were even and unlabored. He was alert, oriented and cooperative. Nurse Terry noted that Plaintiff was complaining of pain to his left side, from approximately his chest to below his knee. He reported pain of a level 8/10. She observed that he had left sided weakness in his grips, with the right side stronger than the left. He was ambulatory to medical and back to his dorm, and his gait was steady. He was alert and oriented.

32. On March 6, 2020, Nurse Terry related her findings concerning Plaintiff's condition to me, and I issued medical orders for prednisone (anti-inflammatory) 20 mg twice per day for five days and Tizanidine (Zanaflex, a muscle relaxer) 4 mg, one tablet by mouth twice per day as needed. I added orders to go to the ER for any change in Plaintiff's neurological status. Plaintiff refused to take the prednisone, stating that it caused him to have eye problems. The prednisone was discontinued due to Plaintiff's refusal.

33. On March 13, 2020, Plaintiff submitted a Sick Call Request, stating, "Severe heart pain, blurred vision and numbness on both sides. I do pray for your assistance in this matter". He indicated that he had experienced this problem for two weeks.

34. Nurse Wright saw Plaintiff in the Jail medical office on March 13, 2020. She noted that his blood pressure was 130/60, respirations were 18, pulse was 67, oxygen saturation was 100%, and temperature was 97.7. She observed and noted that his skin was warm and dry, and he was alert, oriented and cooperative. He complained of a burning sensation over his body, blurred vision, numbness in his leg and bottom of his feet. His grips were even.

35. On March 13, 2020, Nurse Wright related her findings to me. I issued medical orders for blood tests, including a CBC, CMP, Sed Rate, and Med Tox.

36. On March 14, 2020, medical staff collected blood from Plaintiff and submitted it

to Quest Diagnostics for testing.

37. On March 17, 2020, Quest Diagnostics issued a lab report regarding Plaintiff's blood sample. His liver enzymes were high; AST was 129, and ALT was 143. I reviewed and initialed the lab report on March 25, 2020.

38. On March 18, 2020, Plaintiff submitted a Sick Call Request stating "Congestive cough, migraine headaches, along with chest pains. I still have severe numbness up and down my left side." He indicated that he had experienced these problems for one month.

39. On March 20, 2020, Nurse Terry saw Plaintiff in the Jail medical office. She noted that Plaintiff's blood pressure was 100/52, pulse was 87, respirations were 18, oxygen saturation was 94, and temperature was 99.8. His skin was warm and dry, abdomen was soft, pupils were equal and reactive, respirations were even and unlabored, and his gait was steady. He was alert, oriented and cooperative. She also noted that he had a clear, productive cough and headache. His frontal sinuses were tender to touch, throat was sore, he was sneezing, and his eyes were itchy and watery. His lungs were clear bilaterally, and he denied any shortness of breath.

40. On March 20, 2020, Nurse Terry informed me of her findings. I issued medical orders for a Z-Pack (azithromycin), and for CTM (Chlor-Trimeton, an antihistamine) 4 mg, one tablet by mouth twice per day for five days.

41. On March 25, 2020, I issued medical orders for hepatitis testing, due to the fact that Plaintiff had elevated liver enzymes. A specimen of Plaintiff's blood was collected on March 26, 2020, and was sent to Quest Diagnostics for testing. On March 27, 2020, Quest reported that Plaintiff was non-reactive for hepatitis A, B, and C.

42. During the month of March 2020, pursuant to my medical orders, the Jail nursing staff provided Plaintiff with the following medications: aspirin 81 mg, one tablet daily; amlodipine 5 mg, 1 tablet by mouth each evening; atorvastatin 40 mg, 1 tablet per day by mouth; mirtazapine 15 mg, one tablet by mouth at bedtime, levothyroxine 50 mg, one tablet by mouth daily, lithium carbonate 300 mg, one capsule by mouth daily, omeprazole 20 mg one capsule by mouth daily; Zanaflex 4 mg, one tablet by mouth twice per day as needed; Chlor-Trimeton (an antihistamine)(4 mg, one tablet by mouth per day for five days, and azithromycin (Z-pack). I also ordered prednisone 20 mg, one tablet by mouth twice per day, but Plaintiff refused to take this medication, so it was discontinued.

43. On April 9, 2020, Plaintiff submitted a Sick Call Request stating "I am having some serious problems with my left side."

44. On April 9, 2020, Nurse Terry saw Plaintiff in the Jail medical office for

complaints of difficulty using his left side. He informed her that he had experienced this problem for 2 ½ months. Nurse Terry noted that Plaintiff had a history of a TIA (transient ischemic attack) in January 2020, which affected his left side. She observed and noted that he had weakness to his left hand and also to his left lower extremity. She added, "No change in status – physically or neuro since last visit. Will consult with CRNP for further orders." She contacted me, and I issued orders for physical therapy.

45. On April 27, 2020, Plaintiff submitted a Sick Call Request stating "Severe mobility lost on my left side. With same symptoms happening on my right." He indicated that he had experienced these symptoms for 90 days.

46. On April 28, 2020, Nurse Terry saw Plaintiff in the Jail medical office. She noted that Plaintiff had a history of a TIA in January 2020 and was reporting weakness to his left side. She added, "No change from last visit. L side weaker than R, gait steady." She noted that his gait was steady, and he was alert and oriented, with no neurological status changes. She explained and provided Plaintiff with educational material informing him that weakness is normal after a TIA. Plaintiff indicated that he understood and requested to be cleared for work release. Nurse Terry advised Plaintiff that the CRNP would have to do that.

47. During the month of April 2020, pursuant to my medical orders, the Jail nursing staff provided Plaintiff with the following medications: aspirin 81 mg, one tablet daily; amlodipine 5 mg, 1 tablet by mouth each evening; atorvastatin 40 mg, 1 tablet per day by mouth; mirtazapine 15 mg, one tablet by mouth at bedtime, levothyroxine 50 mg, one tablet by mouth daily, lithium carbonate 300 mg, one capsule by mouth daily, omeprazole 20 mg one capsule by mouth daily, and tizanidine, 4 mg, one tablet by mouth twice per day as needed.

48. On May 13, 2020, Plaintiff submitted a Sick Call Request stating "I can barely walk. I need to see the doctor and my neurologist, and everyday it's getting worse."

49. Nurse Terry saw Plaintiff in the Jail medical office on May 16, 2020. She noted, "States sometimes trying to walk he locks up sometimes. States not a lot of movement due to being in a smaller dorm. Requesting to see CRNP for possible neuro consult."

50. On May 20, 2020, I saw Plaintiff in the Jail medical office for a chronic care evaluation. I noted that Plaintiff's pupils were equal and reactive, neck was supple, with no bruit, heart sounds were regular with no murmur, lungs were clear to auscultation, abdomen was soft and nontender, with no palpable mass and bowel sound in all four quadrants, and his pulses were present in all four extremities. I noted that Plaintiff had diagnoses of hypertension, GERD, a history of a CVA, hypothyroidism, and bipolar disorder.

12

51.On May 20, 2020, I issued medical orders for blood tests, including a CBC, CMP, lipid panel, lithium, TSH, free T4, and PSA levels. I also ordered a referral for a physical therapy consultation within two weeks.

52.On May 22, 2020, Plaintiff submitted a Sick Call Request stating, "I need to talk to you concerning my medication and when does my rehab start".

53.On May 22, 2020, the Jail medical staff faxed requests for Plaintiff's medical records to South Central Medical Center and Crenshaw County Hospital Mental Health.

54.On May 23, 2020, Jail medical staff collected a sample of Plaintiff's blood and submitted it to Quest Diagnostics for testing.

55.On May 26, 2020, Quest Diagnostics provided a laboratory report, which showed that Plaintiff's liver enzymes were high; his AST was 583, and ALT was 233.

56.On May 27, 2020, I issued medical orders for an ultrasound of Plaintiff's liver, due to elevated liver enzymes.

57.On May 30, 2020, Jail medical staff collected a sample of Plaintiff's blood and sent it to Quest Diagnostics for analysis. On June 2, 2020, Quest reported that Plaintiff's ANA screen was positive, and his ANA titer was 1:640.

58.During the month of May 2020, pursuant to my medical orders, the Jail nursing staff provided Plaintiff with the following medications: aspirin 81 mg, one tablet daily; amlodipine 5 mg, 1 tablet by mouth each evening; levothyroxine 50 mg, one tablet by mouth daily, lithium carbonate 300 mg, one capsule by mouth daily, omeprazole 20 mg one capsule by mouth daily; atorvastatin 40 mg, 1 tablet at bedtime; and tizanidine 4 mg, one tablet by mouth twice daily as needed.

59.On June 4, 2020, an ultrasound was performed of Plaintiff's abdomen. Radiologist physician, Anne Glaser, M.D. reported that "the liver parenchyma is normal and uniform without hepatic mass, cyst or biliary ductal dilatation". She concluded that the abdominal ultrasound was negative.

60.On June 10, 2020, I issued medical orders to discontinue Plaintiff's atorvastatin, and to recheck his liver function studies in four weeks.

61.On June 24, 2020, Plaintiff was seen and began treatment at Andalusia Health Physical Therapy & Sports Medicine for an initial evaluation. The therapist recommended that Plaintiff attend physical therapy two to three times per week until September 24, 2020.

62. On June 24, 2020, I issued medical orders for physical therapy three times per week for six to eight weeks, due to left-sided weakness from a CVA (cardiovascular event).

63. During the month of June 2020, pursuant to my medical orders, the Jail nursing staff provided Plaintiff with the following medications: aspirin 81 mg, one tablet daily; amlodipine 5 mg, 1 tablet by mouth each evening; levothyroxine 50 mg, one tablet by mouth daily, lithium carbonate 300 mg, one capsule by mouth daily, omeprazole 20 mg one capsule by mouth daily; and tizanidine 4 mg, one tablet by mouth twice daily as needed. They also provided him with atorvastatin 40 mg, 1 tablet by mouth at bedtime from June 1, 2020, to June 9, 2020.

64. On July 1, 2020, I saw Plaintiff in the Jail medical office. I observed and noted that Plaintiff complained of joint pain in his knee and ankles and had swelling in his legs. I also noted that Plaintiff was able to bear weight on his legs with the help of physical therapy. Plaintiff was chair bound, with pitting edema in both legs and knees, his heart sounds were normal, with no murmur, lungs were clear to auscultation bilaterally. Plaintiff complained of pain with range of motion to both knees.

65. On July 1, 2020, I issued medical orders for blood tests for rheumatoid factor, anti DS DNA, Anti-CCP, Sed Rate, CRP, and BNP. I also issued orders for ibuprofen (for pain), 600 mg by mouth twice per day as needed, Lasix (for swelling) 20 mg by mouth, once per day for 10 days, and an x-ray of Plaintiff's left knee.

66. Plaintiff's left knee was x-rayed on July 2, 2020; the radiologist reported that there was no abnormality.

67. On July 2, 2020, medical staff collected specimens of Plaintiff's blood, and sent the specimens to Quest Diagnostics for analysis. On July 9, 2020, Quest issued a report showing that Plaintiff's Sed Rate was high, at 28 mm/h, his rheumatoid factor and C-reactive protein were within range, and his cyclic citrullinated peptide (CCP) AB (IGG) was negative.

68. On July 9, 2020, Nurse Wright was notified to go to Plaintiff's cell because he was complaining of chest pain. Nurse Wright had Plaintiff brought to the medical office in a wheelchair. She assessed Plaintiff and noted that his oxygen saturation was 81%, and blood pressure was 144/80. His fingers were cool to the touch. She replaced the batteries in her pulse oximeter, and upon re-measurement, noted that his oxygen saturation was 95% on room air. He was in no apparent distress, and his heart rate was 112. Plaintiff informed Nurse Wright that he had sharp pains under his left arm, and stated, "I feel like I felt before when I had my stroke in January". Nurse Wright contacted me and informed me of her findings. At my direction, she gave Plaintiff Tylenol for pain.

69.On July 9, 2020, I issued medical orders to send Plaintiff to the emergency room for evaluation. Plaintiff was transported to the emergency room at Andalusia Health. Nurse Terry spoke to the emergency room and was informed that Plaintiff was found to be having a heart attack, and that he would be transferred to Baptist Hospital in Pensacola, Florida. Plaintiff did not return to the Jail.

70.From July 1, 2020 to July 9, 2020, pursuant to my medical orders, the Jail nursing staff provided Plaintiff with the following medications: aspirin 81 mg, one tablet daily; amlodipine 5 mg, 1 tablet by mouth each evening; levothyroxine 50 mg, one tablet by mouth daily, lithium carbonate 300 mg, one capsule by mouth daily, omeprazole 20 mg one capsule by mouth daily; tizanidine 4 mg, one tablet by mouth twice daily as needed; ibuprofen 800 mg by mouth twice per day as needed; and from July 4th through 9th, Lasix 20 mg by mouth once per day.

71.During Plaintiff's incarceration in the Jail, he was provided medical attention for all medical conditions as submitted on Sick Call Slips contained in Plaintiff's medical record. He has never been refused timely and appropriate medical treatment by Nurse Terry or any other members of the SHP medical staff.

72.Neither Nurse Terry nor any of the Jail medical staff have ever denied or improperly delayed medical treatment to the Plaintiff.

73.All of the treatments and medications provided to Plaintiff by the nursing staff were in accordance with medical orders issued by me.

74.All of the medications and treatments ordered for Plaintiff by me were medically appropriate and within the applicable medical standard of care.

75.The SHP medical staff and Nurse Terry have provided Plaintiff with all of the medications, treatments, outpatient visits, and other medical care ordered by me.

76.Based on my education, training and experience, and my personal examinations and treatment of Plaintiff, it is my professional medical opinion that Plaintiff has received prompt and appropriate medical treatment for all his medical complaints. All his medical attention, including medications and treatments has been within the applicable medical standard of care.

77.It is further my opinion that no act or failure to act by me, Nurse Terry or any member of the medical staff proximately caused any injury to the Plaintiff. On no occasion was the Plaintiff ever at risk of serious harm from any action or inaction of any member of the Jail medical staff, nor was I, Nurse Terry or any member of the SHP medical staff ever indifferent to any complaint that Plaintiff has made.

(Doc. 69-2 at pp. 3-17).  Defendant Kristen Terry's affidavit testimony confirms Edgington's

testimony concerning the availability of health care to Plaintiff at the Covington County Jail and her opinion likewise confirms that the quality of care provided to Plaintiff "was prompt, appropriate and within the applicable medical standard of care."  (Doc. 69-1 at p. 16).

## B.  OFFICIAL CAPACITY

To the extent Plaintiff lodges claims against the Defendants in their official capacities and seeks monetary damages, these Defendants are entitled to absolute immunity.  Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  As the Eleventh Circuit has held,

> the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees]. There are two exceptions to this prohibition: where the state has waived its immunity or where Congress has abrogated that immunity. A State's consent to suit must be unequivocally expressed in the text of [a] relevant statute. Waiver may not be implied.  *Id.*  Likewise, Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement.

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted).  Thus, a state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996). Neither waiver nor abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14.  The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit. *Selensky*, 619 F. App'x at 849 (citing *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (consent is prohibited by the Alabama Constitution). "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress

abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence*, Ala., 916 F.2d 1521, 1525 (11th Cir.1990)).

In light of the foregoing, all Defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity). Accordingly, all claims against Defendants in their official capacities for monetary damages are due to be dismissed.

## C.   DELIBERATE INDIFFERENCE

The court will now turn its attention to the Plaintiff's claim that the Defendants treated him with deliberate indifference by providing to him the wrong medication from January 27, 2020, until August 5, 2020, which left him paralyzed.  (Docs. 1, 74).  As noted supra at FN 2, the undisputed medical records demonstrate that after July 9, 2020, Plaintiff was no longer housed in Covington County Jail. (Doc. 69-2 at p. 15).  In his amended complaint, Plaintiff fails to allege any conduct by named Defendants after his discharge from the Jail which he claims caused him harm.  (Doc. 74).  Moreover, the Court notes the Plaintiff's allegation that the CT scan taken the morning after his arrest on January 28, 2020, was "falsefiled {sic] in the medical exhibit to try to hide the stroke found" is unsubstantiated by the medical record. (Doc. 74 at p. 2).  Indeed, the medical record confirms that the day following his arrest he was transferred to the emergency room at Andalusia Health, where he was treated for "acute bacterial bronchitis, left-sided weakness resolved left shoulder pain, and TIA (transient ischemic attack)."  (Doc. 69-2 at p. 5).  The records

further explains that "a TIA is not a stroke.  It is a temporary blockage of blood flow to the brain.

A TIA may cause temporary weakness or loss of feeling in a person's face, arm, or leg on one side

of the body, trouble walking, trouble moving the arms or legs, trouble seeing, loss of balance or

coordination, headache, and other symptoms."  (Doc. 69-2 at pp. 5-6).  Finally, the medical records

confirm that upon his return to the Jail on January 29, 2020, Defendant Edgington established a

course of treatment for the Howard-Bey, as directed by the emergency room physician. *Id.*

In order to establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[]

must show: (1) a serious medical need; (2) the defendant['s] deliberate indifference to that need;

and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*,

588 F.3d 1291, 1306–07 (11th Cir. 2009).  When seeking relief based on deliberate indifference,

an inmate is required to establish "an objectively serious need, an objectively insufficient response

to that need, subjective awareness of facts signaling the need and an actual inference of required

action from those facts." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott v.*

*Foley*, 182 F.3d 1248,1255 (11th Cir. 1999) (holding that, for liability to attach, the official must

know of and then disregard an excessive risk to the prisoner).  Regarding the objective component

of a deliberate indifference claim, the plaintiff must first show "an objectively 'serious medical

need[]' . . . and second, that the response made by [the defendants] to that need was poor enough

to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy,

'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state

law." *Taylor*, 221 F.3d at 1258 (internal citations omitted).  To proceed on a claim challenging the

constitutionality of medical care, "[t]he facts alleged must do more than contend medical

malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment."  *Daniels v.*

*Williams*, 474 U.S. 327, 330–33 (1986).  Furthermore, the mere fact that an inmate desires a

different mode of medical treatment does not amount to deliberate indifference violative of the Constitution. *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985).

Besides the objective component, the Plaintiff must satisfy a subjective prong by showing that the Defendant acted with deliberate indifference. *Chandler v. Crosby,* 379 F. 3d 1278, 1289-90 (11th Cir. 2004). This does not require that the prison official purposefully acted to cause harm, but it does involve something beyond mere negligence. *Id.* The Eleventh Circuit has recently clarified under the subjective prong, that a Plaintiff must demonstrate a Defendant "acted with more than gross negligence" to demonstrate deliberate indifference. *Wade v. McDade*, 67 F. 4th 1363, 1373 (11th Cir. 2023) (granting summary judgment for nurses and holding that their failure to ensure inmate received his daily doses of anti-convulsion medicine did not rise to the level of "more than gross negligence") *citing Goebert v. Lee Cnty.,* 510 F.3d 1312, 1330 (11th Cir. 2007) ("an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay.")(Quotation omitted). Indeed, the Defendant must know of and disregard an "excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837. In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id; see also, Wade*, 67 F. 4th at 1374.

Based upon the Court's independent review of the medical records, the Court concludes that Plaintiff's claim of deliberate indifference fails. Indeed, the undisputed medical evidence demonstrates that Howard-Bey was treated many times by jail medical personnel and was also sent to the emergency room for outside evaluations multiple times when additional care was needed. (Docs. 69-2 at pp. 3-17; 69-1 at pp. 4-17). He also received physical therapy on multiple

occasions.  *Id.*  Additionally, Plaintiff's high cholesterol and need for a statin is well documented in the records.  *Id*.  However, following lab work on Plaintiff showing elevated liver enzymes, the statin was discontinued, then reissued to Plaintiff for a short period of time and ultimately discontinued while Plaintiff was housed at Covington County Jail.  (Doc. 69-2 at pp. 12-16; Doc. 69-1 at pp. 12-16).  Also, the record confirms that Plaintiff suffered a stroke sometime prior to his incarceration for which he received treatment while housed at Covington County Jail.  (Doc. 69-2 at p. 4; Doc 69-2 at p. 4).  Thus, the record is devoid of evidence from which this Court could conclude that Defendants Terry and Edgington "acted with more than gross negligence" when providing medical treatment to Plaintiff.  *Wade,* 67 F. 4th at 1373 (11th Cir. 2023).  Further, the Court concludes that at most Plaintiff has demonstrated his desire for a different mode of medical treatment, which under the current law, does not amount to deliberate indifference violative of the Constitution.  *Hamm,* 774 F.2d at 1575. Accordingly, summary judgment is due to be granted as to all Defendants on Plaintiff's claims for deliberate indifference.

### D. RESPONDEAT SUPERIOR

Plaintiff alleges that Southern Health Partners, ("SHP"); Kristen Terry, LPN and Medical Team Administrator for SHP; Jeff Edgington, Certified Registered Nurse Practitioner who holds contract with SHP as the Medical Director at Covington County Jail, are liable to him in their supervisory positions based on a theory of respondeat superior for the alleged actions or inactions of unnamed correctional officers or other medical personnel. The law is well established; supervisory officials cannot be held liable in § 1983 actions under any theory of respondeat superior or vicarious liability.  *See, Belcher v. City of Foley,* 30 F.3d 1390, 1396-97 (11th Cir. 1994).

Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S.Ct. 1937, 1948 (2009); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler County*, 268 F.3d 1014, 1035 (11th Cir. 2001) (A supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999), citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S.Ct. 1949. Thus, liability for the alleged unconstitutional conditions could attach to Defendant Warden Richie if she either "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [her] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

Indeed, a causal connection maybe established either when (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so" or when (2) "a supervisor's custom or policy. . . result[s] in deliberate indifference to constitutional rights" or when (3) "facts support an inference that the supervisor directed the subordinate to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (Citations omitted). Based upon the Defendants' undisputed affidavit

testimony, the medical records, and the court's careful review of the Plaintiff's allegations, the court concludes that the Plaintiff's claims against Defendants SHP, Terry and Edgington fail because as stated above the Plaintiff has not demonstrated any Defendant acted with deliberate indifference toward him when they provided medical treatment. Neither has Plaintiff alleged any facts demonstrating that Defendants were aware of any wide-spread abuse in medical services, nor has he demonstrated that any Defendant proffered a custom or policy resulting in deliberate indifference to his medical needs.  Also, he has failed to allege any fact demonstrating Defendants knew their subordinates, who are not identified by Plaintiff in his complaint, acted unlawfully. Accordingly, any claims against SHP, Kristen Terry, LPN, and Jeff Edgington, Certified Registered Nurse Practitioner, in their supervisory capacities also fail for the reasons stated above.

For the above stated reasons, it is the RECOMMENDATION of the Magistrate Judge that

1.     The Defendant's motions for summary judgment (Docs 59, 60, 69, 82 and 102) be GRANTED.

2.     Judgment be GRANTED in favor of the Defendants.

3.     This case be DISMISSED with prejudice.

4.     Costs be taxed against the Plaintiff.

On or before **August 1, 2023**, the plaintiff may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which he objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The plaintiff is advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of

factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993)("When the magistrate provides such notice and a party still fails to object to the findings of fact and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 18th day of July, 2023.

/s/ Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE